**CRAWFORD'S AUTO CENTER, INC., Petitioner,**

v.

**COMMONWEALTH of Pennsylvania, PENNSYLVANIA STATE POLICE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 3, 1994.

Decided Feb. 24, 1995.

Reargument Denied April 20, 1995.

H. Michael Cohen, for petitioner.

Michael S. Sherman, Asst. Counsel, for appellee.

Thomas L. Whiteman, for intervenor County of Chester.

Before SMITH and FRIEDMAN, JJ., and RODGERS, Senior Judge.

FRIEDMAN, Judge.

Crawford's Auto Center, Inc. (Crawford's) appeals from an order of the Board of Claims (Board) dismissing Crawford's claim against the Pennsylvania State Police (PSP) for payment of towing and storage costs.[1] We reverse and remand.

Beginning on or about June 1, 1982, as part of an ongoing criminal investigation of

1. The County of Chester, an additional defendant, filed a brief in which it asserted that the Board granted the County's motion for a nonsuit after trial. Thus, although we can find no mention of the nonsuit in the record, it appears that the County is no longer a party. This does not affect our decision in this appeal.

chop shops [2] in southeastern Pennsylvania, PSP troopers directed Crawford's to tow, pick-up, recover, impound and store allegedly stolen vehicles and vehicle parts. These vehicles and vehicle parts included four forty-foot trailers, a Peterbilt Tractor/Sleeper Cab and various truck parts, including a Marmon Detroit diesel engine, a Marmon rear axle tandem assembly, a Mack transmission and Mack carrier axles. According to Crawford's President, Stephen Behrndt, the PSP directed Crawford's to impound the items and, despite repeated inquiries from Crawford's, the PSP did not release the items for return to owners or for sale. (R.R. at 302a, 303a, 317a–320a, 392a, 428a.)

In July of 1984, the insurance company for the owner of the Peterbilt Tractor/Sleeper Cab filed for release of the vehicle and, by stipulation, the insurance company and the PSP agreed to pay Crawford's for the cab's towing and storage. (Board's Findings of Fact, No. 22.) As to the remaining items, in July of 1985, Crawford's sent a statement to the PSP seeking $67,204 as reimbursement for their towing and storage.[3] (R.R. at 32a.) For several months thereafter, Crawford's sent statements to the PSP each month, adding $2,250 for monthly storage charges to the past due balance. (R.R. at 33a–37a.) By the time Crawford's filed its complaint against the PSP in December of 1985, the total charges on the items remaining at Crawford's amounted to $78,454. (R.R. at 37a.)

In 1986, as a result of the PSP's efforts, (Board's Findings of Fact, No. 25), two sheriff's sales were held. At the first, in February of 1986, several vehicles with removed or obliterated Vehicle Identification Numbers were sold pursuant to section 7105 of the Vehicle Code, 75 Pa.C.S. § 7105. (R.R. at 85a–88a, 473a.) Other items which could not be disposed of in this manner, including parts of a Marmon tractor and trailer which had

been used in insurance fraud, were eventually forfeited under the Crimes Code and sold at a second sale in August of 1986. (R.R. at 85a–88a, 473a.) From these sales, Crawford's received $14,500, of the over $78,000 it claimed. (Board's Findings of Fact, No. 25.)

In June of 1993, after a hearing, the Board found that the PSP had no liability for payment of the remaining towing and storage fees because no contractual relationship existed between Crawford's and the PSP.

On appeal,[4] Crawford's contends that the PSP is liable for the towing and storage charges on theories of implied-in-fact or of quasi-contract. The PSP disagrees and, in addition, claims that Crawford's action was not brought within six months of when it accrued and, thus, is time barred.

### I. *Implied Contract Claim*

■ Contracts may be express or implied. An express contract is one where the parties specifically express the terms of the agreement, either orally or in writing. *Department of Environmental Resources v. Winn,* 142 Pa.Commonwealth Ct. 375, 597 A.2d 281 (1991), *appeal denied,* 529 Pa. 654, 602 A.2d 863 (1992); RESTATEMENT (SECOND) OF CONTRACTS § 4 (1981). An implied contract is one where the parties assent to formation of a contract, but instead of being expressed in words, the intention to incur an obligation is inferred from the conduct of the parties in light of the surrounding circumstances, including the course of dealing. *Cameron v. Eynon,* 332 Pa. 529, 3 A.2d 423 (1939); *Winn;* RESTATEMENT (SECOND) OF CONTRACTS § 4 (1981). Here, Crawford's and the PSP had no express written or oral contract. However, Crawford's asserts that an implied-in-fact contract arose because the PSP, knowing that Crawford's was in the business of towing and storing vehicles, requested Crawford's services, and

---

**2.** The term "chop shop" refers to an illicit operation involving the dismantling of stolen or fraudulently obtained vehicles. *See, e.g., Hettich v. Department of Transportation,* 166 Pa.Commonwealth Ct. 71, 646 A.2d 34 (1994).

**3.** The statements did not include any charges for towing or storage of the Peterbilt Sleeper Cab, which had been settled.

**4.** Our scope of review of a Board of Claims decision is limited to determining whether the Board committed an error of law, whether necessary findings were supported by substantial evidence or whether constitutional rights were violated. *Del–Car Automotive, Ltd. v. Pennsylvania State Police,* 154 Pa.Commonwealth Ct. 535, 624 A.2d 262 (1993).

Crawford's responded by performance. The PSP disagrees with Crawford's, arguing that (1) the PSP officers who directed Crawford's to tow, pick-up, store and secure the vehicles and vehicle parts lacked authority to enter into contracts on the part of the PSP, and (2) no exchange of legal consideration occurred. We agree with Crawford's.

The Restatement of Contracts provides: "A promise may be stated in words either oral or written *or may be inferred wholly or partly from conduct.*" [5] RESTATEMENT (SECOND) OF CONTRACTS § 4 (1981) (emphasis added). The legal effect of a contract inferred from conduct, called an implied or implied-in-fact contract, is the same as that of an express one. The distinction between an express and an implied contract lies "merely in the mode of manifesting assent.... [I]ntention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance." RESTATEMENT (SECOND) OF CONTRACTS § 4 cmt. a (1981).

### A. Authority

■■■ The PSP contends that the officers who directed Crawford's to tow, pick-up, store and secure the allegedly stolen vehicles and vehicle parts pursuant to the PSP's crim-

inal investigation did not have authority to do so. Crawford's responds that the PSP is estopped from denying the authority of these troopers because it clothed them with apparent authority. Under the circumstances here, we agree that the PSP is contractually liable to Crawford's under agency principles of apparent authority and estoppel.[6]

■ Apparent authority arises from a manifestation by a principal that another is his agent. RESTATEMENT (SECOND) OF AGENCY § 8 cmt. a (1958). "The term 'apparent authority' has been broadly used by the courts to describe the power which agents have in creating liability against their principals, although without authority." *Id.* cmt. f.

Here, the evidence shows that, in past dealings, the PSP had not denied the authority of the troopers, dispatchers, and other PSP personnel to direct Crawford's to pick-up vehicles. Thus, the PSP as an entity had implied to Crawford's that the troopers had authority to contact Crawford's directly for such services. Furthermore, the PSP accepted Crawford's services and left the items at Crawford's for approximately four years, presumably because no other location equivalent to Crawford's was available.[7] By such

---

**5.** An illustration of an implied-in-fact contract, remarkably similar to the situation here, follows the rule set forth above:

A telephones to his grocer, "Send me a ten-pound bag of flour." The grocer sends it. A has thereby promised to pay the grocer's current price therefor.
RESTATEMENT (SECOND) OF CONTRACTS § 4 illus. 1 (1981).

**6.** Although comment d of section 8 distinguishes apparent authority from estoppel, both are applicable here. With regard to estoppel, section 8B of the Restatement Second of Agency states:

§ 8 B. Estoppel—Change of Position
(1) A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if
(a) he intentionally or carelessly caused such belief, or
(b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts.

....
(3) Change of position, as the phrase is used in the restatement of this subject, indicates payment of money, expenditure of labor, suffering a loss or subjection to legal liability.
In addition, other agency theories, such as Ratification, may also be applicable. *See, e.g.,* RESTATEMENT (SECOND) OF AGENCY Ch. 4 (1958).

**7.** With regard to why Crawford's was used initially, Clifford Shaw, who was in charge of the undercover criminal investigations of chop shops in southeastern Pennsylvania pursuant to which Crawford's received its directions, testified:

Q. ... Now, was there any particular reason that you utilized the services of Crawford's rather than another company for the towing and storage of these vehicles?
A. Well, they have an enclosed lot. It is fenced in, can be locked. I think they also had the equipment necessary to tow truck tractors and flatbed semi-trailers down to their lot.
Individuals with those capabilities were at a premium, as I recall, in Chester County.
....

actions, the PSP manifested that the troopers acted as its agents in arranging for Crawford's services. Thus, the PSP is liable to Crawford's under both apparent authority and estoppel theories.

## B. Consideration

■ We also disagree with the PSP's contention that no contract arose because there was no exchange of legal consideration. In *Commonwealth Federal Savings and Loan Association v. Pettit*, 137 Pa.Commonwealth Ct. 523, 586 A.2d 1021 (1991), cited by the PSP, there was no exchange of consideration because the savings and loan association was required to pay fees for the filing of writs and the prothonotary was statutorily required to accept the writs for filing. Simply stated, because there was no contract, there could be no breach of a contract. Here, however, the towing and storage service performed by Crawford's was not one required of it by law. PSP had a mandatory duty to impound and store allegedly stolen vehicles and vehicle parts and Crawford's was entitled to be paid for providing requested tow-

ing and storage services which aided the PSP in the performance of *its* duties. Because Crawford's was not legally bound to provide these services for the PSP, sufficient consideration for formation of a contract exists here.[8]

## C. Implied Promise of Payment

■ Having concluded that an implied-in-fact contract arose here when the PSP asked Crawford's to perform a service for it and Crawford's responded with performance, we must still determine the terms of the contract. The terms of such a contract may be inferred from the conduct of the parties, as "understood in light of the circumstances, including course of dealing or usage of trade or course of performance." RESTATEMENT (SECOND) OF CONTRACTS § 5 cmt. a (1981). Here, the previous course of dealing included a request for services by the PSP with Crawford's usually receiving payment for its services through a variety of sources, including portions of the proceeds of the sale of the vehicle or vehicle parts as provided in the Vehicle Code, 75 Pa.C.S.

---

Q. During the period that you were employed with the State Police and while Crawford's stored these vehicles, did the State Police have an alternative site nearby where they could have stored the vehicles at no charge?

A. Not to my knowledge, no.

(R.R. at 142a–143a.) In addition, Trooper Joseph M. Joy testified:

Q. Why did you utilize Crawford's services in this particular case?

A. The security of the yard where—on Crawford's property, it is not only fenced in, but there are a number of dogs kept there around the clock.

The fact that Crawford's towing would have the proper equipment to come out and take the materials that we were confiscating.

They did have a large enough area on their property to hold this amount and size of vehicles.

And somewhat based, I suppose, on our experiences in the past of dealings with them. If they were called, they would come out and do the job that they were asked.

(R.R. at 223a.) With regard to later evaluation of alternative storage possibilities, Trooper Barry J. Harvey testified:

Q. During the period of time Crawford's stored the property, did the State Police have another facility where they could have stored the vehicles and vehicle parts at no charge?

A. At some point in this whole process, I was contacted by our—my superior in Harris-

burg, and asked if I could find another location in the Chester County area where these vehicles could be stored.

And in doing that, the State Police barracks at Embreeville was mentioned, and also Penn-DOT.

I contacted the local PennDOT district, and they told me that they had no facility large enough that was secure. They did have one facility, but it was unfenced and it was not secure.

Subsequently, I also had a conversation with the Station commander at Embreeville and was assured that there was no room at the barracks for the storage of these trailers.

(R.R. at 257a–258a.)

8. Consideration is defined as:

The inducement to a contract.... Some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility, given, suffered, or undertaken by the other.

Legal consideration is:

One recognized or permitted by the law as valid and lawful; as distinguished from such as are illegal or immoral. The term is also sometimes used as equivalent to "good" or "sufficient" consideration.

Black's Law Dictionary 277–78 (5th ed. 1979). See also, RESTATEMENT (SECOND) OF CONTRACTS § 71 (1981).

§§ 101–9910,[9] or from the owner or insurance company seeking release of the vehicle. (Board's Findings of Fact, No. 16.) Thus, we can infer a promise that Crawford's would be paid for its services from the previous course of dealings. The question presented here is how and if payment is to be made when the usual sources of payment have been exhausted and have not covered the costs of the services.

The testimony of both the PSP troopers involved and Crawford's indicates that the towing and storage related to this criminal investigation was not comparable to any previous course of dealings between the parties because of the number and size of the vehicles and vehicle parts, the need to keep them secured, the length of time that they remained stored, and the difficulty identifying owners. (R.R. at 150a, 257a, 393a–394a.)[10] Here, the PSP asked Crawford's to tow, pick-up, store and secure the vehicles and vehicle parts, told Crawford's not to release these items until authorized, advised Crawford's that these vehicles could not be disposed of pursuant to statutory provisions for disposing of abandoned vehicles, delayed in following through on procedures for selling the vehicles on which the identification numbers had been removed or falsified and delayed in following through on forfeiture of

other items pursuant to the Crimes Code. R.R. at 73a–75a, 87a, 181a–182a, 191a, 266a, 286a, 424a.) Meanwhile, the vehicles and vehicle parts depreciated while storage costs increased. Thus, when the sheriff's sales finally occurred, they yielded only 18.5% of Crawford's charges. (R.R. at 37a; Board's Findings of Fact, No. 25; Board's op. at 5.)

■ Under these circumstances, the previous course of dealings does not establish the exclusive basis for determining how Crawford's is to be paid for its services, and we simply cannot accept the Board's conclusion that, as a matter of law, the PSP had no liability for payment of the towing and storage costs.[11] Rather, we believe that an implied contract was formed but that an essential term was omitted, perhaps because the parties failed to foresee the situation which arose. Although the rule has not yet been specifically adopted in Pennsylvania,[12] we are guided by section 204 of the Restatement (Second) of Contracts:

§ 204. Supplying an Omitted Essential Term

When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties,

9. The provisions of the Vehicle Code do not indicate that the salvor becomes the owner of the vehicles and then sells them. Rather, with regard to both abandoned vehicles and those with removed or falsified vehicle identification numbers, the Vehicle Code provides that excess proceeds from a sale eventually be deposited in the Motor License Fund. 75 Pa.C.S. §§ 7105(c) and 7308(c). Thus, the salvor is reimbursed for towing and storage costs and the Commonwealth, not the salvor, retains any excess proceeds of the sale.

10. For instance, Clifford Shaw testified:

Q. Had you, previous to this situation, dealt with one like it in terms of resolving the disposition of vehicles and vehicle parts of this nature?

A. No, I hadn't.

(R.R. at 150a.) Trooper Harvey, who was also involved in the case, testified:

Q. Had you ever dealt with trying to resolve disposition of vehicles in a situation similar to this one before this incident occurred?

A. Not anything like this, no.

Q. You had dealt with Crawford's in the past, I assume—

A. Absolutely.

Q. —but you never had a situation like this involving Crawford's or anybody else, for that matter, in terms of trying to dispose of vehicles of this nature?

A. No, not this extent, no.

(R.R. at 257a.)

11. Despite the fact that the Board determined that no contractual relationship existed between Crawford's and the PSP, it also apparently believed that the previous course of dealings provided the exclusive basis for determining the manner and amount of the payment to Crawford's, and, thus, it concluded that the PSP had no liability for payment of the towing and storage costs.

12. The rule has been referred to in *Gallagher v. Upper Darby Township*, 114 Pa.Commonwealth Ct. 463, 539 A.2d 463, *appeal denied*, 520 Pa. 622, 554 A.2d 513 (1988) and in *Marzullo v. Stop–N–Go Food Stores of Pittsburgh, Inc.*, 364 Pa.Superior Ct. 106, 527 A.2d 550, *appeal denied*, 517 Pa. 599, 535 A.2d 1058 (1987), but not specifically applied.

a term which is reasonable in the circumstances is supplied by the court.

Comment d to section 204 discusses the process of supplying a missing term:

Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention. Both the meaning of the words used and the probability that a particular term would have been used if the question had been raised may be factors in determining what term is reasonable in the circumstances. But where there is in fact no agreement, the court should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process.... [W]here there is a contract for the sale of goods but nothing is said as to price the price is a reasonable price at the time for delivery.

RESTATEMENT (SECOND) OF CONTRACTS § 204 cmt. d (1981). The reporter's note to this section of the Restatement states that the section is new and cites to treatises on the law of contracts by Corbin and by Williston. In discussing similar situations, Corbin states:

In innumerable cases, courts have been required to determine whether one who has received services rendered by another ever made a promise to pay for them.

. . . .

When an express request for services has been made by the party who receives them and who is benefited by them, this fact alone may be sufficient to justify the inference of a promise to pay reasonable value.... [A] party receiving the benefit of the plaintiff's requested service is regarded as unjustly enriched by them if he pays nothing. This may well be held to be a sufficient basis for a non-contractual obligation, while at the same time justifying the inference of a promise in fact. In many specific cases, the courts have found it unnecessary to draw a fine distinction between these two bases of the obligation to pay the reasonable value of services so rendered and received.

3 Arthur L. Corbin, Corbin on Contracts, § 566 (1960).

Applying the inference of a promise to pay a reasonable value, we conclude that the PSP is liable to Crawford's for the reasonable value of its services and that the $14,500 received from the sale of vehicles and vehicle parts under the Vehicle Code does not adequately compensate Crawford's for its efforts. We, thus, reject the notion that the amounts received from sheriff's sales, insurance companies, restitution, etcetera are the exclusive source of payment in a situation such as this where Crawford's provided its services at the request of the PSP. However, we do not necessarily accept Crawford's contention that the amount billed, based upon the posted amounts and later increases in the posted amounts, reflects the reasonable value of Crawford's services. For example, Crawford's and similarly situated salvors may ordinarily give volume discounts or negotiate reduced rates. Therefore, we will remand to the Board to supply the omitted essential term and for computation of a reasonable payment to Crawford's in light of the circumstances.

## II. *Quasi Contract Claim*

■ We could end our analysis at this point; however, we recognize that the line between implied-in-fact contracts and quasi or implied-in-law contracts is sometimes indistinct. RESTATEMENT (SECOND) OF CONTRACTS § 4 cmt. b (1981) and 3 Corbin on Contracts, § 566. Moreover, we acknowledge that we base our conclusion that an implied in fact contract arose between the PSP and Crawford's on section 204 of the Restatement of Contracts, a new section which has not been discussed and adopted by the Pennsylvania Supreme Court. Accordingly, we also analyze this case under the concept of quasi contract.

■ A quasi contract is not really a contract at all, but a fictional contract which is a form of the remedy of restitution. *Cameron; Pettit.* "A quasi contract arises where the law imposes a duty upon a person, not because of any express or implied promise on his part to perform it, but even in spite of any intention he might have to the contrary." *Cameron*, 332 Pa. at 532, 3 A.2d at 424. A

quasi contract requires that a party unjustly enriched by the services of another pay a reasonable amount for those services. *Winn.* The PSP argues that it was not unjustly enriched but that, even if it was, public policy precludes requiring payment for Crawford's services. We disagree.

The doctrine of unjust enrichment expresses the general principle that a party unjustly enriched at the expense of another should be required to make restitution for the benefits received where it is just and equitable to do so, and "where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly." Black's Law Dictionary 1377 (5th ed. 1979); *Winn.* Here, the PSP had a duty to pursue its criminal investigations and Crawford's services enabled them to do so. Thus, the PSP benefited from Crawford's services and Crawford's suffered a detriment by towing and picking up vehicles and vehicle parts and storing them securely in their yard for approximately four years without payment. For the PSP to retain this benefit without compensating Crawford's for its services constitutes unjust enrichment.[13] In such a situation, restitution under the "quantum meruit" theory is appropriate,[14] unless public policy precludes payment.

The PSP contends that the Board lacks authority to direct the PSP to pay Crawford's charges because such direction would have a chilling effect on the PSP's willingness and enthusiasm for enforcing the laws of the Commonwealth and would, therefore, be against public policy. We fail to see how imposing liability on the PSP as an agency would chill the PSP's performance of its mandatory duties. Rather, we agree with Crawford's that imposing liability on the PSP

in this instance would encourage the PSP to take timely action to dispose of items such as those involved here and not unfairly burden salvors with unwarranted storage. Indeed, we believe that non-payment would be more likely to have a chilling effect on performance of the PSP's duties because salvors and others might be less inclined to aid the PSP if the PSP could refuse payment under these circumstances. Requiring the PSP to pay for these services simply means that the PSP must have an adequate budget to perform its statutorily mandated duties; this should present no public policy difficulty.[15] Therefore, had we not determined that an implied-in-fact contract existed, the PSP would have been liable to Crawford's under a quasi contract theory, and Crawford's would be entitled to recover in quantum meruit.

### III. *Accrual of Crawford's Cause of Action*

■ Finally, we address the PSP's contention that Crawford's action is untimely. Section 6 of the Act of May 20, 1937, P.L. 728, *as amended,* 72 P.S. § 4651–6, provides that claims against the Commonwealth must be presented to the Board within six months after the claim accrues. According to the PSP, because the towing involved a flat fee and the storage a daily flat fee, Crawford's could have detailed the charges immediately. Thus, the PSP argues that Crawford's cause of action accrued at the time Crawford's initially towed or stored the items. Crawford's counters, asserting that the statute of limitations does not begin to run until the claimant is affirmatively notified that the invoices will not be honored. We agree.

In *Del–Car Automotive, Ltd. v. Pennsylvania State Police,* 154 Pa.Commonwealth Ct.

---

**13.** The Board determined that the PSP had not been unjustly enriched, but rather had aided Crawford's in fostering and advancing its business. (Board's op. at 8 and 9.) The Board is undoubtedly correct that Crawford's business is aided by good relations with the PSP; however, that does not negate the PSP's responsibility to treat Crawford's justly and equitably. In this situation, given the magnitude of the towing and storage, the complications which arose and the duration of the storage, the PSP received benefits far in excess of any aid to Crawford's business.

**14.** "Quantum meruit" describes the extent of the PSP's liability on a contract implied-in-law and actually means "as much as he deserves." Black's Law Dictionary 1119 (5th ed. 1979).

**15.** In most cases, as in most of Crawford's previous dealings with the PSP, the towing and storage costs will be recouped from other sources, including sale of the vehicle pursuant to statute. *See, e.g., Del–Car Automotive, Ltd. v. Pennsylvania State Police,* 154 Pa.Commonwealth Ct. 535, n. 2, 624 A.2d 262, n. 2 (1993). Only rarely, when those sources do not cover the costs, will the PSP be called upon to pay the difference.

535, 624 A.2d 262 (1993), also a salvor case, we said that a cause of action accrues when the claimant is first able to litigate a claim; that is, when the amount due under the claim is known and the claimant is capable of preparing a concise and specific written statement detailing the injury. We continued: "[T]he statute of limitations runs from the time a claimant is affirmatively notified that he will not be paid by the Commonwealth. In such cases, we have required that the denial of the claim be unequivocal." *Id.* at 539, 624 A.2d at 264 (citations omitted). Because Crawford's was never notified that its charges would not be honored, the statute of limitations does not bar Crawford's action.

Accordingly, we hold that the Board erred as a matter of law in determining that the PSP had no liability to Crawford's in this matter, and we remand to the Board to hold a hearing, if necessary, and to issue a decision supplying the omitted essential term of the implied contract between the PSP and Crawford's by computing a reasonable payment to Crawford's in light of the circumstances.

### ORDER

AND NOW, this 24th day of February, 1995, the order of the Board of Claims, dated June 23, 1993, is reversed and this case is remanded to the Board of Claims to hold a hearing, if necessary, and to issue a decision supplying the omitted essential term of the implied contract between the Pennsylvania State Police and Crawford's Auto Center, Inc. by computing a reasonable payment to Crawford's Auto Center, Inc. in light of the circumstances.

Jurisdiction relinquished.

SMITH, J., concurs in the result only.